HANLON, JUDGE:
Claimant contractor entered into a contract with respondent, designated as Project No. X320-G-73.02(03) or Federal Project No. APD-323(84), on February 19, 1982, for the construction of that portion of Corridor G from Davis Creek to Charleston, West Virginia. The project commenced with fill bench construction involving blasting and excavating the earth’s surface. Preconstruction conferences were held on March 3 and March 17, 1982, and notice to proceed was given. Claimant substantially completed the project on or about June 15, 1986. The project was accepted by respondent on July 27, 1987. The total amount of the contract for this project was $27,950,257.59. Claimant alleges its actual cost for construction was $34,323,000.00, with a resulting loss in excess of $6,617,449.00 not including interest. On June 30, 1988, claimant executed the final Voucher Estimate for the project in the amount of $27,708,281.10, reserving the right to bring certain claims, hereafter identified as issues. Claimant filed this action against the respondent in a 42-count Complaint demanding judgment in the amount of $7,453,096.00, plus interest, on the following issues:
I.
FAILURE TO COMPENSATE CLAIMANT FOR MATERIALS IN ACCORDANCE WITH CONTRACT PROVISIONS
*36 Claimant contends that the contract required respondent to pay claimant for ‘aggregate base course” in an agreed upon quantity of 39,204 cubic yards to be paid in a lump sum. Respondent applied the unit bid price to 35,768 cubic yards rather than the quantity of 39,204 cubic yards as provided in the contract. Claimant argues that this resulted in an underpayment of $109,952.00 which remains unpaid. Respondent denies the allegation. The amounts involved are uncontroverted. The only issue for the Court is whether the claimant should be paid for unexpended materials, as in this claim for aggregate base course which was not used on the project. There is no reason in law or equity for respondent to pay claimant for 39,204 cubic yards of base aggregate when only 35, 768 cubic yards were provided. This portion of the claim is denied.
II.
CALCULATION OF FUEL ADJUSTMENTS
The fuel adjustments provided under the contract were to be based upon 39,204 cubic yards of base course. Claimant alleges that respondent applied the adjustment with an erroneous calculation and that $6,500.00 remains unpaid. Respondent denies this allegation. Pursuant to West Virginia Department of Highways Special Provision For Price Adjustment of Fuels, §109.10, dated February 15, 1980, and incorporated in the claimant’s Bid Proposal, this item could have been paid if properly due. It is the finding of the Court that this item represents a fuel adjustment based upon the difference between the 39,204 and 35,768 cubic yards of base aggregate, an amount previously disallowed, and, in accordance with that finding, the Court denies this item.
III.
WATER AREA RELOCATION
Respondent approved the change and use of a waste area situate between station 263 +03 and station 269+00. Respondent designated in this area for claimant’s use throughout the construction of the project. Claimant thereupon used the area for filling and stockpiling stone. On or about May 24, 1984, when claimant had stockpiled 39,000 cubic yards of stone in the designated area, respondent ordered claimant to immediately remove the stone. Claimant compiled with this request, but alleges that it lost approximately 19,800 cubic yards of stone during the relocation. Claimant has introduced evidence that the amount of $5.80 per cubic yard is the customary and reasonable cost of this stone. The expense to claimant for the lost stone is $115,830.00. Claimant further alleges that it also had increased costs for equipment, labor, and overhead resulting from the relocation of the stone. The Court recognizes that the order to remove the stockpiled stone was unilateral on the part of the respondent. The claimant relied upon representations made to it by respondent to its detriment. It is the opinion of the Court that the claimant is entitled to recover the cost of the stone lost during the relocation operation; however, the Court denies the cost for equipment, labor, and overhead. Accordingly, the Court will make an award to claimant in the amount of $115,830.00 for this item.
*37 IV.
PLAN ERRORS-WATER LINE, GAS LINE, SEWER LINE, TELEPHONE LINE, AND ELECTRICAL POWER LINE LOCATIONS
The contract required various water, gas, electric, sewer, and telephone lines to be relocated on the project. Numerous water lines and other underground utilities were mistakenly cut and damaged when utility plans failed to indicate the proper locations of the lines. As a result, claimant alleges increased costs for relocating and repairing the broken lines. Claimant also alleges numerous errors and omissions in the locations of the designated utilities. Additional excavation was necessary causing inefficiencies and increased costs unanticipated under the contract. Claimant concludes that as a result of the inadequate utility plans, its schedule was interrupted resulting in increased equipment, labor, and overhead and other costs. Claimant contends that respondent breached an implied warranty of the sufficiency of the plans and specifications under the contract, thereby entitling claimant to be compensated for the increased costs. The claimant cites as its authority §104.2 of the 1978 Standard Specifications of the West Virginia Department of Highways, which provides in part:
Should the Contractor encounter or the Department discover during the progress of the work subsurface or latent physical conditions at the site differing materially from those indicated in the contract, or unknown physical conditions at the site of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in the contract, the Engineer shall be notified in writing of such conditions; and if the engineer finds the conditions do materially differ and cause an increase or decrease in the cost of, or the time required for performance of the contract, an equitable adjustment will be made and the contract modified in writing accordingly.
Respondent asserts that claimant was informed that there was no guarantee of the exactness of the utility locations. Respondent cites as its authority the 1978 Stand Specification §105.6 which states:
In general, it is to be understood that the Contractor has considered in his bid all of the permanent and temporary utility appurtenances in their present or relocated positions as shown on the Plans, and that no additional compensation will be made by the State for any delays, inconvenience, or damage sustained by him due to interference from the utility appurtenances or the operation of moving them. The locations of the underground utilities shown on the Plans have been obtained by diligent field checks and searches of available records. It is believed that they are essentially correct, but the Department makes no guarantees as to their exact locations. (Emphasis supplied.)
Respondent further contends that in Tri-State Stone v. Dept. of Highways, 9 W. Va. Ct. Cl. 90 (1972) this Court held that the risk of extra expense for utility relocations falls upon the *38 contractor. Respondent believes that even if the utility relocations constituted “changed conditions”, claimant should seek compensation only for those changes which were “noticed” to respondent. Respondent established that claimant failed to provide the required notice of the changed conditions resulting from utility relocations and should not be compensated. See Westbrook Construction, Inc. v. Division of Highways, Cc-89-508, W.Va. Ct.Cl., unpublished opinion (1991). The Court finds that the claimant is bound by the terms of the contract which provided that the respondent did not guarantee the locations of the utilities; therefore, the Court denies this portion of the claim in its entirety.
V.
DEFECTIVE PLANS - STORM DRAINAGE SYSTEM
The plans and specifications provided by respondent for the claimant indicated the location of storm drainage systems which allegedly contained design defects relative to grade alignment and elevation. Additional errors are alleged for junction chambers and bend structures with no consideration to the potential interferences with other utilities. Claimant contends that the storm drainage plan errors caused increased costs for extra excavation, extra embankment, topographical grading, and unanticipated rock excavation. Claimant alleges s breach of an implied warranty of sufficiency of the plans and specifications for performing the contract, and that it incurred additional costs in the amount of $135,232.00 as a result of this breach. Respondent restates its position that it is not a guarantor of the sufficiency of plans. The Court determined that all costs attributed to this item must be denied upon the same principals previously enunciated by the Court in the discussion of the utility issue.
VI.
UNILATERAL REDUCTION OF BLASTING LIMITS
Claimant entered into the contract in reliance upon the plans and specifications that permitted blasting at a maximum peak particle velocity (p.p.v.) of any shot of 2.0 inches per second. Claimant initiated its blasting operations utilizing the 2.0 p.p.v. per second through the summer of 1983. Respondent unilaterally ordered a blasting limit reduction to a maximum p.p.v. of 1.0 inches per second.
On August 22, 1983, claimant formally objected to the respondent’s new limit of 1.0 inch per second. Claimant appears to have requested a meeting to be held in the District Office of the respondent in order for respondent to justify this change and for the claimant to explain to respondent that its blasting records demonstrated that it had been meeting all the specifications. Respondent replied by correspondence dated September 7, 1983, informing claimant that if it presented evidence that no damage had occurred as a result of claimant’s blasting, respondent would consider restoring the maximum peak particle velocity to 2.0. Claimant was unable to do this as there had been some damage to buildings in the area due to fly rock.
*39 As a result of respondent’s directive, claimant changed its blasting techniques. An analysis of claimant’s blasting records reveals that after September 1, 1983, claimant reduced the average amount of explosives per hole from 33.97 lbs. to 18.33 lbs. (or 46%); decreased average hole depth from 14.03 feet to 12.33 feet (or 12%); and decreased its average powder column height from 7.87 feet to 5.63 (or 28%).
These unilateral reductions as mandated by respondent attenuated the progress of claimant’s excavation, grading, utility relocation, and bridge work. Prior to the change, claimant’s grading cycle consisted of excavation (blasting), loading excavated rock onto a truck and trucking the rock directly into fills. Due to the reduction in the parameters of claimant’s excavation, the rock generated by blasting was so large that much of it had to be reblasted and subsequently broken up by a crane with a pumpkin ball before it could be used in the fill operations. In addition, the blasting reduction resulted in smaller cuts, thus confining the work area. It appears to the Court that the changes caused a significant reduction in production and productivity. Claimant introduced trucking records revealing that after September 1, 1983, excavation production was reduced by approximately 50%, from nearly 80,000 cubic yards per month to less than 4,000 cubic yards per month.
As a result of the blasting reduction, claimant completed grading operations ten months behind schedule, was forced into one unplanned winter of work, and was required to spend an additional eight months to shoot and move rock material on the project. Claimant states that increased costs for equipment, labor, fuel, and overhead resulted as enumerated at page 14 herein.
Respondent avers that it was not timely notified that claimant expected extra compensation due to peak particle velocity reductions. Accordingly, respondent contends that the claimant’s failure to provide notice of the changed conditions precludes claimant from receiving compensation for any alleged extra work. Respondent cites as its authority Vecellio and Grogan v. Department of Highways, 14 W.Va. Ct.Cl. 451 (1983), and Westbrook Construction, Inc. v. Division of Highways, CC-89-508, a W.Va. Ct. Cl., unpublished (1991), wherein this Court denied compensation to claimant contractors for changed conditions where notice was not provided to respondent and force account records were not maintained by respondent.
The Court finds that the blasting reduction caused additional costs to the claimant, but these costs are not construed as “extra work” as defined by §105.17 of the Standard Specifications. Extra work contemplated under §105.17 is work outside of the contract. The blasting reduction and resulting costs to the claimant involved work clearly within the contract. The Court stated in C.J. Langenfelder & Son, Inc. v. State of West Virginia and the State Road Commission of West Virginia, 8 W.Va. Ct. Cl. 197 (1971), that work clearly covered within the contract is not “extra work.” Accordingly, the provisions of §705.77are not applicable. Claimant incurred increased costs for performing the blasting operation, and the Court will make an award for a portion of these costs as discussed in the Damages section of this Opinion.
A portion of this loss represents extra costs incurred as a result of a storm in 1986. On *40 May 10, 1986, claimant formally notified respondent that it was substantially completed with the project. On May 12 and 13, 1986, a severe storm occurred and caused significant damages to complete work. On May 13, 1986, claimant’s officials met with respondent’s Project Engineer to request extra payment for the washed out areas pursuant to the “Act of God” clause contained in the specifications. Standard Specifications Roads and Bridges Adopted 1978, §107.16.
Since the occurrence of the storm does not bring claimant within the “Act of God” provision, claimant contends that had it been allowed to perform its work in accordance with the original blasting specifications, the project would have been completed prior to the storm. For replacing the washed out areas claimant alleges additional costs of $107,000.00. The Court denies this portion of the claim as claimant has failed to establish any liability on the part of the respondent.
VII.
TRAFFIC CONTROL PLAN DESIGN CHANGES AND UNREASONABLE DELAYS IN IMPLEMENTING SUCH CHANGES
The urban location of the construction contract required claimant to provide unimpeded domestic traffic flow throughout the construction site in its traffic control plan. Detours could and did cause construction inefficiency and interruptions to planned construction activities on the project. Although claimant submitted requests for changes in the project traffic control plan, it is alleged that respondent failed to consider the requests in a timely fashion, resulting in unnecessary delay and disruption to construction and contract completion. Claimant contends that respondent breached its duties to administer the traffic control, thereby creating increased costs for equipment, labor, fuel, overhead, and general delay damages, in the amount of $25,176.00. Respondent countered that the contract plans did not require seven-day responses to detour requests and that traffic control was not impeded by the conduct of respondent’s agents. The Court, having reviewed the documents pertaining to this item of damage, is of the opinion to make an award to the claimant in the amount of $20,624.00.
VIII.
REFUSAL TO ACCEPT COMPLETED WORK
Claimant put forth a claim on behalf of its subcontractor, Charleston Construction, Inc., for increased costs which resulted when respondent would not accept certain pavement and shoulder work. Specifically, claimant was required to remove and replace approximately eighty feet of 24' wide pavement, fifty feet of 3" wide roadway shoulder, and thirty feet of 10" wide roadway shoulder in the area of Station No. 312+50. As a result of removing and replacing the described roadway pavement and shoulder, claimant alleges its subcontractor incurred additional labor, equipment, and materials in the amount of $10,954.85, however, Claimant’s Exhibit No. 33 shows the actual costs to be $10,254.85;
*41 Respondent denies that it is responsible for the costs of removing and replacing the pavement.
The evidence established that there was a water problem beneath the pavement which caused the pavement to settle. The claimant placed the pavement in accordance with the specifications of the contract. The Court is of the opinion that the replaced pavement was necessitated by factors which were not within claimant’s control. The Court makes an award for $10,254.85 for this item of damages.
IX.
FAILURE TO COMPENSATE CLAIMANT FOR WORK PERFORMED AND COSTS INCURRED
Claimant requests additional costs resulting from respondent’s revisions to the retaining wall constructed at Station No. 385+00. The work involved in this revision was paid for by respondent under the unit bid prices; however, the amount of $200.00 remains due and owing for surveying. Respondent admits that the described retaining wall survey cost is properly due, and has agreed that claimant is entitled to recover $200.00 for this work; the Court therefore makes an award for the $200.00.
Claimant subcontractor, N.H. Stone, Inc., installed and relocated chain link fence in the area of Route 119 and Route 601. A change in a controlled access right-of-way unilaterally implemented by respondent resulted in increased costs for fencing in the amount of $1,022.61. Respondent does not deny that additional fencing was required by these changes in the contract. The Court makes an award in the amount of $1,022.61 for this item.
As a result of the delays in the performance of this contract, claimant’s subcontractor, Charleston Construction, Inc., incurred increased costs for labor and concrete plant equipment rental. Claimant requests the amount of $49,319.91 for the increases costs. However, the actual cost, according to the calculations of the subcontractor, was $46,093.30. The Court makes an award to claimant on behalf of this subcontractor in the amount of $46,093.40.
Respondent directed claimant to relocate a quarry road to provide better access for residential driveways in the area. Claimant relocated the quarry road, thereby incurring increased labor, equipment, fuel, and overhead costs for which claimant has not been paid. Claimant has not provided documentation of the increased costs for this road, and the Court will not speculate as to same. This item is denied.
At the conclusion of the project, claimant was ordered to backfill and landscape areas not called for under the original contract. Claimant seeks additional compensation for its extra costs incurred for such construction activity, but “force account records” were not maintained for this “extra work.” The Court will also deny this portion of the claim.
*42 DAMAGES
In order to calculate the additional costs incurred by claimant with respect to the blasting claim, the utilities claim and traffic control claim, claimant used two alternative methods, one based on lost productivity and one based on delay. Respondent contends that these calculations are theoretical. As to the blasting claim, claimant’s damage analyses were based upon claimant’s certified payrolls and equipment records, which tracked each piece of equipment while it was on the job. Claimant’s damages arising from the blasting change were calculated by comparing actual pre-change and post-change excavation productivity to determine the additional costs incurred by Holloway for the productivity analysis. The scheduling analysis also examined pre-change and post-progress records to determine the delay caused by the change.
Claimant’s expert witness, Thomas P. Dekar, furnished an analysis of the blasting, utility, and traffic control claims by utilizing the actual labor and equipment records.
Respondent objected to Dr. Dekar’s calculations of actual direct labor cost, especially to the markup of 40% to cover overhead.* The markup is permissible by §109.4.1 of the Specifications where force account records are maintained. Force account records were not maintained; therefore, the 40 % markup will bot be considered by the Court as an item of the damages. The 7 % prime contractor markups will not be included by the Court on any of the items of damages.
Claimant asserts that the following enumerated costs resulted from the delays associated with utility relocations, blasting reduction, and traffic control, collectively in the amounts of:
Gross Labor $2,172,341.54
40% Overhead Markup* 868,936.62
Payroll Taxes & Insurance 477,915.13
Union Fringes 332,473.78
Equipment 3,041,349.00
Quantity Control 17,633.81
PL & PD Insurance 140,000.00
$7,050,649.88
The Court has determined that this itemization is more accurate for determining the actual damages sustained by the claimant.
Without reviewing the relative merit of each item at this time, nor adjusting or disallowing same, the Court must first determine the issue raised by the respondent that timely notice was not provided, whereupon the respondent did not maintain force account records. Respondent avers that the failure to notice the respondent’s engineer that there were changed condition(s) requires the disallowance of all such items. Section 109.4.8 of the West Virginia Department of Highways Specifications of 1978 further provides that:
The Contractor’s representative and the (respondent’s) Engineer shall *43 compare records daily of the cost of work done as ordered on a force account basis, and shall indicate agreement by signature on such records.
No payment will be made for work performed on a force account basis until the Contractor has furnished the Engineer with duplicate itemized statements of the cost of such force account work detailed.
It is uncontroverted that force account records were not maintained. But this is not a claim asserting “extra work.” It is, in the language in Langenfelder, “essentially a claim for damages resulting from a breach of contract, causing losses to the contractor sounding in tort.” Id. Claimant has demonstrated by a preponderance of the evidence that substantial damages were suffered in the performance of this contract.
The Court concludes that the unilateral breach of contract by the respondent relating to the reduction of blasting limits was the direct and proximate cause of claimant’s most significant increased costs. However, the Court finds that the claimant was in part responsible for the increased costs by not exercising greater diligence in the performance of the blasting operations. There were other problems encountered by claimant during the blasting operations which may have contributed to the 50% decrease in efficiency, including, but not limited to, the method of the blasting operations and the haul road problems. The Court is of the opinion that the respondent’s action in limiting the peak particle velocity contributed to at least 37.5% of the delays experienced by claimant. Therefore, the Court will make an award for 75% of the increased costs. The Court, having reviewed all of the particulars put forth by claimant, makes an award for two portions of the blasting delay. The gross labor costs and the insurance portions are awarded by the Court in the amount of$l,747,481.52.
A recapitulation of the award made by the Court for all items considered hereinabove is as follows:
Blasting Operations $1,747,481.52
Waste Area Relocation 115,830.00
Subcontractor (Charleston Construction, Inc). Extra Costs 46,093.40
Subcontractor (Charleston Construction Inc.) Pavement Replacement 10,254.85
Traffic Control 20,624.00
Subcontractor (N.H. Stone, Inc.) Fencing 1,022.61
*44 Retaining Wall Survey Costs _200.00
TOTAL $1,941,506.38
The Court is of the opinion to and does award to claimant and its subcontractors the amount of $1,941,506.38, plus interest in the amount of $464,994.00 in accordance with the provisions of W.Va. Code §14-3-1, for a total award of $2,406,500.38.
Award of $2,406,500.38.